# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MARVIN SCOTT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 15 C 8864** |
| v. | ) | |
| | ) | **Chief Judge Rubén Castillo** |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case addresses the aftermath of one of the darkest periods in Chicago Police Department ("CPD") history—the torture and abuse of more than one hundred suspects from 1972 to 1991 by now-disgraced CPD Commander Jon Burge ("Burge") and his subordinates. On May 6, 2015, over twenty years after Burge's firing, the Chicago City Council (the "City Council") passed the Reparations for Burge Torture Victims Ordinance (the "Ordinance"), which created a $5.5 million fund for the survivors of the police torture. Plaintiff Marvin Scott ("Scott") brings his complaint against the City of Chicago (the "City") pursuant to 42 U.S.C. § 1983 alleging that the Ordinance violates the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. (R. 6, Compl.) Presently before the Court is Defendant's motion to dismiss the complaint. (R. 14, Mot.) For the reasons stated below, Defendant's motion is granted.

## BACKGROUND AND FACTS

I.      **Burge's Brutality: 1972-1991**

While Plaintiff's complaint does not delve into the crimes of Burge and his subordinates, a very brief history is necessary to put Plaintiff's claims into context.[1] Burge "joined the CPD in 1970 and rose to commanding officer of the violent crimes section in the 1980s, but his career was marked by accusations from over one hundred individuals who claimed that he and officers under his command tortured suspects in order to obtain confessions throughout the 1970s and 1980s." *United States v. Burge*, 711 F.3d 803, 807 (7th Cir. 2013). In fact, "Burge presided over an interrogation regime where suspects were suffocated with plastic bags, electrocuted until they lost consciousness, held down against radiators, and had loaded guns pointed at their heads during rounds of Russian roulette." *Id.* at 806. These interrogations took place in Area 2 and Area 3 of the CPD headquarters. *People v. Wrice*, 962 N.E.2d 934, 944 (Ill. 2012). Eventually, Burge was suspended in 1991 and fired in 1993. *Burge*, 711 F.3d at 807; *see also Moore v. Burge*, 771 F.3d 444, 448 (7th Cir. 2014). Many years later the Circuit Court of Cook County appointed special prosecutors to investigate the allegations of torture. *Burge*, 711 F.3d at 807. However, due to the statute of limitations, these special prosecutors never brought charges against Burge for the brutality that he inflicted. *Id.* In 2006, the State's Attorney released a report concluding that Burge and his colleagues had engaged in systematic torture of suspects. *Wrice*, 962 N.E.2d at 944-45 (summarizing the report's conclusions). While Burge was never convicted of the crimes that occurred at Area 2 and Area 3, he was convicted of perjury and

---

[1] For a detailed discussion of the Burge police torture, the subsequent creation of the Illinois Torture Inquiry and Relief Commission, and the efforts to pass the reparations legislation, see G. Flint Taylor, *The Chicago Police Torture Scandal: A Legal and Political History*, 17 CUNY L. REV. 329 (2014). *See also* G. Flint Taylor, *The Long Path to Reparations for the Survivors of Chicago Police Torture*, 11 NW. J.L. & SOC. POL'Y 330 (2016); *United States v. Burge*, No. 08 CR 846, 2009 WL 2386147, at *1 (N.D. Ill. July 29, 2009) (collecting news articles reporting on the abuses that occurred).

obstruction of justice for falsely denying under oath that he and detectives under his command had engaged in torture and abuse and that he was aware of this torture and physical abuse of suspects. *Burge*, 711 F.3d at 803 (affirming conviction).

## II.    The Ordinance and Resolution

On May 6, 2015, the City Council unanimously passed the Burge Reparations-Resolution (the "Resolution"), which extended a formal apology to the victims of Burge's torture. CHICAGO, ILL., BURGE REPARATIONS RESOLUTION SR2015-256 (2015). The Resolution recognized that Burge "was fired in 1993 for torturing a confession from a murder suspect" and that "[m]ore than 100 African-Americans who were detained by the Chicago Police Department between 1972 and 1991 have accused Burge or police officers working under his command of engaging in acts of torture and physical abuse." *Id.* at 1. The Resolution extended the following apology to the victims:

> WHEREAS, The City Council wishes to acknowledge this exceedingly sad and painful chapter in Chicago's history, and to formally express its profound regret for any and all shameful treatment of our fellow citizens that occurred; and
>
> WHEREAS, The City Council recognizes that words alone cannot adequately convey the deep regret and remorse that we and our fellow citizens feel for any and all harm that was inflicted by Burge and the officers under his command. And yet, words do matter. For only words can end the silence about wrongs that were committed and injustices that were perpetrated, and enable us, as a City, to take the steps necessary to ensure that similar acts never again occur in Chicago; and
>
> WHEREAS, The apology we make today is offered with the hope that it will open a new chapter in the history of our great City, a chapter marked by healing and an ongoing process of reconciliation; and
>
> WHEREAS, Just as a wrongful act followed by an apology, forgiveness and redemption is part of the shared human experience, so too is the widely held belief that actions speak louder than words[.]

*Id.* The Resolution also promised that all of the individuals who have a credible claim of torture or physical abuse and members of their immediate family would be given, among other things,

free tuition at the City Colleges of Chicago, specialized counseling services, job placement in programs offered by the City, and access to a variety of health-services programs. *Id.* at 1-2.

In addition to the Resolution, the City Council also passed the Ordinance, which put teeth into the City's apology. CHICAGO, ILL., REPARATIONS FOR BURGE TORTURE VICTIMS ORDINANCE SO2015-2687 (2015). Specifically, the Ordinance established a $5.5 million fund in which "[e]ach individual with a credible claim" may receive "up to $100,000 [in financial reparations] minus the amount of [any other] prior compensation" the victim has received. *Id.* § 3(a). The "[p]roportionate share" is "determined by dividing the total amount in the Fund by the total number of eligible claims." *Id.* The Ordinance states that "any Burge victim is eligible for financial reparations," but also sets forth a series of criteria to be considered when "determining whether a claim is a credible claim." *Id.* § 3(b). "Burge victim" is defined as "any individual with a credible claim of torture or physical abuse by Jon Burge or one of the officers under his command at Area 2 or Area 3 Police Headquarters between May 1, 1972 and November 30, 1991." *Id.* § 2. A "credible claim" is defined as a "claim of torture or physical abuse by Jon Burge or one of the officers under his command at Area 2 or Area 3 Police Headquarters between May 1, 1972 and November 30, 1991." *Id.* The Ordinance also sets forth a multilevel process of review by attorneys for the Chicago Torture Justice Memorials organization (CTJM), the City, and a designated and independent third party for determining which individuals are entitled to financial reparations. *Id.* § 3(d)-(f). With this history and legislative framework in mind, the Court now turns to Plaintiff's complaint.

## III.    Plaintiff's Complaint

Plaintiff alleges that on May 10, 1993, he was "remove[d] from [the] Cook County Jail by Chicago police detectives and taken to Area #2," in order to be questioned "for the murder of

Darren Payton and also to be a participant in a line-up." (R. 6, Compl. ¶ 6.) Plaintiff alleges that during the interrogation "he was beaten by Detectives McDermott and Boylan"—detectives who were under Burge's supervision. (*Id.*) As a result of the beating, Plaintiff alleges that he not only sustained injuries to his eye and ribs, but he also "made a coerced confession." (*Id.*)[2]

Based upon these events, on June 16, 2015, Plaintiff applied for reparations under the Ordinance. (*Id.* ¶ 7.) Plaintiff filled out a claim form and sent the accompanying documents supporting his claim to Professor Daniel T. Coyne at Chicago-Kent College of Law.[3] (*Id.*) Shortly thereafter, Coyne informed Plaintiff that he had reviewed Plaintiff's claim form and transcripts, and had determined that "they provide the basic information to open an inquiry into Plaintiff['s] claim to see if Plaintiff is eligible for reparations under" the Ordinance. (*Id.* ¶ 8.) However, Plaintiff's claim was subsequently denied because the alleged abuse occurred on May 10, 1993, which is seventeen months after the time cut-off provided by the Ordinance. (*Id.* ¶ 9.)

---

[2] While not mentioned in the complaint, following a bench trial, public court records show that Plaintiff was convicted of the kidnapping and murder of Darren Payton and sentenced to 50 years. *See* Summary Dismissal, *In re: Claim of Marvin Scott*, Illinois Torture Inquiry and Relief Commission, TIRC No. 2014.208-S, at ¶¶ 1, 6, 7 (January 20, 2016), https://www.illinois.gov/tirc/Documents/Marvin%20Scott%20SUMMARY%20DISMISSAL%20ORDER%20-STAMPED.pdf. In addition, three co-defendants pled guilty to various charges, two co-defendants were found guilty following a jury trial, and one more defendant was found guilty following a bench trial. *Id.* ¶¶ 1, 6 n.6. While the entire record is not available online, public records demonstrate that during Plaintiff's trial, prosecutors agreed not to use any of the statements that Plaintiff made to detectives or prosecutors in the Darren Payton murder case during their case-in-chief or during rebuttal. *Id.* ¶¶ 4, 6. Instead, prosecutors cross-examined Plaintiff when he took the witness stand and used prior statements that he had made in an unrelated criminal trial. *Id.* ¶ 6. In 2010, the Illinois Appellate Court described the evidence against Plaintiff as overwhelming, relying on testimony by co-defendants. *Id.* ¶ 1 n.1 (citing *People v. Scott*, 997 N.E.2d 1010 (Ill. App. Ct. Dec. 30, 2010) (Table, No. 1-09-0059) (affirming dismissal of post-conviction petition)).

[3] The Ordinance directed CTJM to "identif[y] an independent third party . . . to determine whether any claimants not previously identified by CTJM as Burge victims are eligible to receive financial reparations using the criteria set forth in this Ordinance." Ordinance at § 3(f)(2). Professor Coyne was the individual selected as the independent third party. *See City of Chicago Reparations for Burge Torture victims - Frequently Asked Questions*, City of Chicago, http://www.cityofchicago.org/city/en/depts/dol/supp_info/burge-reparations-information/burge-reparations--frequently-asked-questions.html.

As a result of the denial of his claim, Plaintiff alleges that "[i]t is well known that tactics of torture and physical abuse at Area #2 police station go beyond the time of 1972-1991," and "there should be no expiration date on reparations for crimes as heinous as torture and physical abuse." (R. 6, Compl. ¶ 11.) Plaintiff also claims that to "set a time line on such crimes and to say that victims who w[ere] beaten or torture[d] by detectives at Area 2 or 3 after 1991 have no credible claim is a clear violation" of the victims' constitutional rights. (*Id.*) Thus, Plaintiff alleges that the Ordinance—and, specifically, the time limitation imposed—"denied Plaintiff due process and equal protection of the law under the United States Constitution[] and the 14th Amendment." (*Id.* ¶ 10.)

## PROCEDURAL BACKGROUND

On October 5, 2015, Plaintiff filed his *pro se* complaint, which named the Mayor of the City of Chicago, Rahm Emanuel, the City Council, and Coyne as defendants. (R. 1, Compl.) Because Plaintiff is a prisoner, the Court screened the complaint to determine whether it was frivolous, malicious, failed to state a claim for relief, or sought monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. §§ 1915(e)(2) and 1915(A). The Court determined that "the complaint states a colorable federal cause of action." (R. 5, Order at 2.) Thus, the Court directed the City to be substituted in as a defendant, ordered the City to respond to the complaint, and dismissed all other defendants. (*Id.*)

Subsequent to the Court's order, Plaintiff filed a duplicate copy of his *pro se* complaint, (*compare* R. 1, Compl. *with* R. 6, Compl.), and the City then moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), (R. 14, Mot.). After the City filed its motion,

6

Plaintiff retained counsel.[4] (R. 22, Att'y Appearance.) On March 11, 2016, Plaintiff's counsel responded to the motion to dismiss (R. 23, Resp.), and the City filed its reply on March 22, 2016, (R. 24, Reply).

## LEGAL STANDARD

"A motion to dismiss pursuant to Rule 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) (alterations and citation omitted). To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under this standard, the Court "accept[s] as true all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiff." *Kubiak v. City of Chi.*, 810 F.3d 476, 480-81 (7th Cir. 2016). However, the Court "need not accept as true any legal assertions or recital of the elements of a cause of action supported by mere conclusory statements." *Vesely v. Armslist LLC*, 762 F.3d 661, 664-65 (7th Cir. 2014) (citation and internal quotation marks omitted).

## ANALYSIS

### I.  Equal Protection Claim

Plaintiff alleges that the time limitation contained in the Ordinance is a "clear violation" of the Equal Protection Clause. (R. 6, Compl. ¶ 11.) Specifically, Plaintiff claims that the time limitation—which requires that an individual allege that he was tortured between May 1, 1972,

---

[4] For reasons unknown to the Court, Plaintiff's counsel did not seek leave to file an amended complaint, but instead stood on Plaintiff's *pro se* complaint. Thus, because the *pro se* complaint is the only complaint that has been filed, it is the operative complaint. (R. 6, Compl.)

and November 30, 1991, in order to qualify for reparations—violates the Equal Protection

Clause because "there should be no expiration date on reparations for crimes as heinous as

torture and physical abuse." (*Id.*) In support of its motion to dismiss, the City argues that the

Ordinance "easily satisfies" the applicable rational-basis review standard because the City has a

"legitimate interest in apologizing for and providing redress to victims of Burge-related torture

and abuse." (R. 15, Mem. at 3-6.) In response, Plaintiff argues that the Court should apply the

"nondeferential" standard of rational-basis review that was set forth in *City of Cleburne, Texas v.*

*Cleburne Living Center*, 473 U.S. 432 (1985), and that under this standard the "burden rests with

the state" to demonstrate the Ordinance's validity. (R. 23, Resp. at 2-3.) In reply, the City argues

that the application of a "nondeferential" standard of rational-basis review is not supported by

controlling law. (R. 24, Reply at 2-4.)

Because the parties are at odds regarding the applicable standard of review, the Court

begins there. The Equal Protection Clause of the Fourteenth Amendment provides that

government actors may not "deny to any person . . . the equal protection of the laws." U.S.

Const. amend. XIV, § 1. The Supreme Court has explained that the Equal Protection Clause is

"essentially a direction that all persons similarly situated should be treated alike." *Cleburne*

*Living Center*, 473 U.S. at 439. When determining whether a plaintiff has stated an equal

protection claim, a court must first determine whether the challenged actions target a suspect

class (race, alienage, or national origin) or a fundamental right guaranteed by the U.S.

Constitution (freedom of speech or religion). *Id.* at 440; *Srail v. Vill. of Lisle*, 588 F.3d 940, 943

(7th Cir. 2009). "With both suspect classes and denials of fundamental rights, the government's

justification for the regulation must satisfy the strict scrutiny test to pass muster under the Equal

Protection Clause." *Srail*, 588 F.3d at 943. "In the absence of deprivation of a fundamental right

or the existence of a suspect class, the proper standard of review is rational basis." *Id.* Under the rational-basis standard of review, "defendants need only show that the differing treatment was rationally related to a legitimate state interest." *Cochran v. Ill. State Toll Highway Auth.*, --- F.3d ---, 2016 WL 3648335, at *3 (7th Cir. July 8, 2016); *see also Armour v. City of Indianapolis*, 132 S. Ct. 2073, 2079-80 (2012) ("As long as the City's distinction has a rational basis, that distinction does not violate the Equal Protection Clause.").

Plaintiff argues that the Court should apply the standard set forth by Justice Marshall in *Cleburn Living Center*. (R. 23, Resp. at 2-3.) In *Cleburne Living Center*, Justice Marshall—who concurred with the Court's result but not with its analysis—suggested that the Court may have adopted a "second order" rational-basis review that falls somewhere between rational-basis and intermediate scrutiny. *Cleburne Living Center*, 473 U.S. at 458 (Marshall, J., concurring in part); *see also Milner v. Apfel*, 148 F.3d 812, 816 (7th Cir. 1998) (rejecting the standard, but describing it as a " 'sliding scale' approach by which the more marginal the plaintiff's group the more justification the government must show for discriminating against it"). Justice Marshall wrote that while the majority had explicitly rejected a "second order" rational-basis analysis, it nonetheless applied "precisely the sort of probing inquiry associated with heightened scrutiny." *Cleburne Living Center*, 473 U.S. at 458. After urging the Court to apply this "intensif[ied]" rational-basis review standard, Plaintiff concludes with little discussion that "[i]n the case at bar, the clear directive of the ordinance itself has been clearly and dramatically violated." (R. 23, Resp. at 2-3.)

As a preliminary matter, the majority in *Cleburne* did not adopt this "second order" rational-basis review advocated by Justice Marshall, but reaffirmed the well-established rational-basis standard. *Cleburne Living Center*, 473 U.S. at 440. Under that standard, "[t]he general rule

is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* The Supreme Court has since made clear in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 366-67 (2001), that the Court in *Cleburne* applied the "minimum rational-basis" review to the ordinance in question. *Id.* at 366 (internal quotation marks omitted). In addition, the Supreme Court has repeatedly held that absent a suspect class or fundamental right, equal protection challenges are subject to a rational-basis review, not an "intensified" or "nondeferential" rational-basis review. *See, e.g., Armour*, 132 S. Ct. at 2080 ("This Court has long held that a classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." (citation and internal quotation marks omitted)); *Heller v. Doe,* 509 U.S. 312, 319-320 (1993). Thus, in light of overwhelming case law to the contrary, the Court declines to apply the "nondeferential" or "intensified" rational-basis review urged by Plaintiff, as this standard has never been adopted by the Supreme Court. *See Milner*, 148 F.3d at 817.[5]

Because Plaintiff is not alleging that he is a member of a suspect class or was denied a fundamental right, Plaintiff's claim is subject to rational-basis review. *Cochran*, 2016 WL 3648335, at *3; *Srail*, 588 F.3d at 943. "The rational-basis requirement sets the legal bar low and simply requires a rational relationship between the disparity of treatment and some legitimate

---

[5] With no discussion or reference to a specific passage, Plaintiff also asserts that the Supreme Court in *Armour* "outlined" the "nondeferential standard." (R. 23, Resp. at 3.) In *Armour*, the Court held that the City of Indianapolis had a rational basis for its distinction between residents who had already paid their share of municipal project costs and those who had not and, thus, the city did not violate the Equal Protection Clause. 132 S. Ct. at 2080-82. Contrary to Plaintiff's suggestion, the Court applied the familiar rational-basis review standard to the challenged action and not the "nondeferential" review that Plaintiff relies upon. *Id.* at 2080. Thus, Plaintiff's reliance on *Armour* does not persuade this Court that it should apply a standard different than the well-established rational-basis review.

governmental purpose." *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) (citation and internal quotation marks omitted). Moreover, constitutional challenges to legislative acts are "not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc's, Inc.*, 508 U.S. 307, 315 (1993). The burden is on the challenger to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification." *Kopp*, 725 F.3d at 686 (citation and internal quotation marks omitted); *see also Garrett,* 531 U.S. at 367.

The U.S. Court of Appeals for the Seventh Circuit has recognized that a "perplexing situation arises when a lawsuit challenging a government action subject only to rational-basis review is evaluated under the deferential standard of a Rule 12(b)(6) motion to dismiss." *Kopp*, 725 F.3d at 686 (alterations, citation, and internal quotation marks omitted); *see also Flying J Inc. v. City of New Haven*, 549 F.3d 538, 546-47 (7th Cir. 2008). To reconcile these standards, "[t]he solution is to take as true all of the complaint's allegations and reasonable inferences that follow, and then apply the resulting facts in light of the deferential rational basis standard." *Flying J*, 549 F.3d at 546 (alteration, citation, and internal quotation marks omitted). Thus, "even at the pleading stage, a plaintiff must anticipate the burden of eliminating any reasonably conceivable state of facts that could provide a rational basis for the government's actions." *Walker v. Samuels*, 543 F. App'x 610, 611 (7th Cir. 2013) (citation and internal quotation marks omitted). "Likewise, [the plaintiff] must provide a sufficiently plausible basis to overcome the applicable presumption of rationality." *Id.*

In its motion and supporting documents, the City sets forth multiple justifications for its argument that the time limitation imposed by the Ordinance is rationally related to a legitimate objective. The City asserts that the "Ordinance is designed to further the City's legitimate

11

interest in apologizing for and providing redress to victims of Burge-related torture and abuse"

and, to further that purpose, "the Ordinance limits reparations to individuals who allegedly were

abused before Burge was suspended from the Chicago Police Department." (R. 15, Mem. at 4-5.)

The City further explains that it "was rational for the City Council to determine both that the

systemic abuse committed by Burge and his subordinates is uniquely deserving of reparations

and, in addition, that Burge's suspension in 1991 for abusing a suspect sent a message that such

abuse would not be tolerated, ending the pattern of misconduct that occurred under his

supervision." (*Id.* at 5.) In addition, the City argues that the time limitation is reasonable because

it was "rational for the City Council to conclude that individuals abused before Burge was

suspended, and his pattern of misconduct became publicly known, might have difficulty proving

their claims in courts within the limitations period." (*Id.*)

It cannot reasonably be disputed that the government has a legitimate interest in both

compensating the victims of crimes and in remedying the past wrongs of state actors. *See Simon*

*& Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) ("There

can be little doubt . . . that the State has a compelling interest in ensuring that victims of crime

are compensated by those who harm them."); *United States v. Paradise*, 480 U.S. 149, 167

(1987) ("The Government unquestionably has a compelling interest in remedying past and

present discrimination by a state actor."); *Jacobs v. Barr*, 959 F.2d 313, 319 (D.C. Cir. 1992)

(concluding that a federal statute awarding compensation to Japanese Americans who had been

detained in internment camps during World War II, but not awarding any compensation to

Americans of German or Italian descent who had also been detained, did not violate the

plaintiff's equal protection rights because "[t]he Government unquestionably has a compelling

interest in remedying past . . . discrimination by a state actor, especially discrimination as ugly as

the policies endorsed by the government" in this case (internal citation omitted)). In addition, the City has demonstrated a legitimate interest in compensating the victims of these *specific* crimes. In passing the Ordinance and accompanying Resolution, the City set forth its purpose: the City intended to compensate individuals who had credible claims of torture that took place between May 1, 1972, and November 30, 1991, by Burge or his subordinates. *See* Ordinance at § 3; Resolution at 1-2. The City recognized that the acts of torture and physical abuse that Burge and his subordinates perpetrated constituted an "exceedingly sad and painful chapter in Chicago's history." Resolution. Indeed, the City also recognized that the Resolution and Ordinance were attempts to "end the silence about wrongs that were committed and injustices that were perpetrated." *Id.* The apology and remarks conveyed in the Resolution demonstrate that the City unquestionably has a legitimate interest in not only recognizing the wrongs caused, but also taking concrete action to redress these wrongs.

The Ordinance's time limitation is also rationally related to the City's legitimate interest in compensating the Burge victims specifically. The City placed the time cut-off for the reparations eligibility at November 30, 1991. This date is not arbitrary—Burge was suspended on November 8, 1991. *Burge*, 2009 WL 2386147, at *1. In addition, within a few months of the suspension, the CPD's Office of Professional Standards ("OPS") commenced hearings regarding the alleged abuses and the Chicago press began to steadily report on the evidence introduced against Burge. *Id.*; *see also Burge*, 2009 WL 2972915, at *1-3 (providing a timeline from 1990 until 1993 of the OPS investigation, the police board hearings, the Special State's Attorney's investigation, and the subsequent termination of Burge and suspension of other officers). Thus, by late 1991 and early 1992, the reports of torture and abuse were rapidly coming to light. Ultimately, it was reasonable for the City to conclude that by 1991 this dark chapter had (or was

quickly coming) to an end and, in turn, that the implementation of the 1991 cut-off would assist in properly identifying and narrowing the group of individuals who had suffered abuse at the hands of Burge.

Plaintiff argues that there should be no time limitation imposed by the Ordinance because Burge's subordinates continued to do his "handiwork" after he was terminated. (R. 23, Resp. at 1; R. 6, Compl. ¶¶ 6, 11.) Plaintiff claims this is evidenced by the fact that Plaintiff was tortured in Area 2 on May 10, 1993. (*Id.*) There is no way of knowing whether any and all wrongdoing at Area 2 and Area 3 abruptly ended on November 30, 1991. Nor is the Court concluding that the Ordinance covers every plausible claim of torture that any Burge victim may have. However, rational-basis review does not require the Court to reach these determinations. "A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Heller*, 509 U.S. at 321 (citation and internal quotation marks omitted). Indeed, the "legal bar [is] low" and all that is required is a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Kopp*, 725 F.3d at 686 (citation omitted). It light of the events that unfolded by November 1991, it is reasonable to conclude that the City's imposition of this time limit was rationally related to the City's legitimate interest in compensating the Burge torture victims. *See, e.g., Smidt v. Apfel*, No. 97 C 7026, 1999 WL 528481, at *3 (N.D. Ill. July 19, 1999) ("One need only be reasonable to foresee the disaster . . . if there were not a reasonable time limitation for ending disputes about eligibility benefits. Thus, general enforcement of the time limitation does not violate equal protection provisions." (internal citation and quotation)).

The time limitation imposed by the Ordinance is also rationally related to the City's legitimate interest in compensating the victims of the Burge torture regardless of (and in light of)

the fact that the statute of limitations likely bars many of these victims' right to recovery. Indeed, because courts have already determined that some of these victims' claims are time-barred, the City had a concrete concern that without the Ordinance, these victims would be entirely foreclosed from seeking relief. *See, e.g., Jones v. Burge*, No. 11-CV-4143, 2012 WL 2192272, at *3-8 (N.D. Ill. June 13, 2012) (determining that the plaintiff's twelve separate claims arising from his alleged torture in 1982 were time-barred); *Tillman v. Burge*, 813 F. Supp. 2d 946, 968-69 (N.D. Ill. 2011) (finding that plaintiff's claims arising from his alleged torture in 1986 for false arrest and imprisonment and torture were time-barred). The Ordinance is reasonably aimed at creating an abbreviated and efficient process outside of the court system for individuals who are entitled to recovery yet likely time-barred from asserting a claim. *See, e.g., Colaio v. Feinberg*, 262 F. Supp. 2d 273, 300 (S.D.N.Y. 2003) (concluding that the September 11th Victim Compensation Fund's income limit cut-off "is rationally related to Congress' interest in creating an efficiently administered fund, capable of making awards within 120 days following the filing of a claim"). Admittedly, the City's time cut-off may not be the perfect line to draw because it is plausible that an individual (like Plaintiff) could have a claim of police torture under the hands of one of Burge's subordinates that occurred on December 1, 1991, but the claim would be both time-barred in a court of law and the individual would have no right to recovery under the Ordinance. But "the Constitution does not require the City to draw the perfect line nor even to draw a line superior to some other line it might have drawn. It requires only that the line actually drawn be a rational line." *Armour*, 132 S. Ct. at 2083; *see also Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1072 (7th Cir. 2013) ("But legislation does not violate the Equal Protection Clause merely because the classifications it makes are imperfect." (alteration, citation, and internal quotation marks omitted)). The Court finds that the time limitation imposed by the

Ordinance is rationally related to the City's interest in creating an efficient reparations system outside of traditional courts of law that compensate victims whose claims may otherwise be barred.

Finally, Plaintiff's equal protection claim does not allege sufficient facts to support the inference that the City acted irrationally in passing the Ordinance. Because government entities are presumed to act rationally, Plaintiff must plead sufficient facts "to overcome the presumption of rationality that applies to government classifications." *Kopp*, 725 F.3d at 686 (citation omitted). In addition, the burden is on the plaintiff to negate "every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Heller*, 509 U.S. at 320 (internal citation and quotation marks omitted). The Ordinance is presumed constitutional and Plaintiff has not pled any factual content to demonstrate that the City's actions were not rational. *See Flying J*, 549 F.3d at 547-48 (affirming the district court's motion to dismiss on a rational-basis standard in which it was able to hypothesize several reasons for the ordinance); *Akbar v. Daley*, No. 09-cv-1289, 2009 WL 3055322, at *5 (N.D. Ill. Sept. 18, 2009) ("Plaintiff does not even attempt to argue that the placement of red light cameras is not rationally related to some legitimate state purpose or that no set of facts reasonably could be conceived to establish a rational basis for the choice of intersections."); *Brett, N. v. Cmty. Unit Sch. Dist. No. 303*, 2009 WL 424546, at *4 (N.D. Ill. Feb.18, 2009) (dismissing an equal protection challenge because plaintiff had not negated the rationality of the policy or demonstrated that it was wholly unrelated to any legitimate state objective).

For all of these reasons, the Court concludes that the time limitation imposed by the Ordinance is rationally related to the City's legitimate interest in compensating the victims of the police brutality and torture that Burge and his subordinates perpetrated. Put simply, the

Ordinance does not violate the Equal Protection Clause of the Fourteenth Amendment. Thus, the Court dismisses Plaintiff's equal protection claim.

## II. Procedural Due Process Claim

Plaintiff also alleges that the Ordinance "pass[ed] by Chicago City Council and Rahm Emanuel denied Plaintiff due process" and that "to set a time limit on such crimes and to say that victims who [were] beaten or tortur[ed] by detectives at Area 2 or 3 after 1991 have no credible claim is a clear violation of due process."[6] (R. 6, Compl. ¶¶ 10, 11.) The City argues that Plaintiff's procedural due process claim fails because it "consists solely of a legal conclusion," and also because "Plaintiff has not pleaded any of the required elements" to state a claim. (R. 15, Resp. at 6-7.) In response, Plaintiff argues that he "has provided detailed factual allegations as to how his due process rights were violated" and that his "due process claim could not be any clearer." (R. 23, Resp. at 3 (citation and internal quotation marks omitted).)

"[T]he Fourteenth Amendment's Due Process Clause affords state citizens with the right to notice and an opportunity to be heard before being deprived of 'property' as defined by state law." *Taake v. Cty. of Monroe*, 530 F.3d 538, 543 (7th Cir. 2008). To determine whether a plaintiff has stated a procedural due process claim, the Court must consider two things. "First, [a court must] determine whether the defendants deprived the plaintiff of a protected liberty or property interest, and if so, then [the court will] assess what process was due." *Abcarian v. McDonald*, 617 F.3d 931, 941 (7th Cir. 2010) (citation omitted). "Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). "[T]he threshold question is whether a protected property interest actually exists." *Booker-El v. Superintendent, Ind. State*

---

[6] While the complaint does not specify whether Plaintiff is bringing a substantive or procedural due process claim, Plaintiff's response clarifies that he is only bringing a procedural due process claim. (R. 23, Resp. at 3.)

*Prison*, 668 F.3d 896, 900 (7th Cir. 2012) (citation omitted). "Although the Fourteenth Amendment protects property rights, it does not create them. Instead, property rights are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Frey Corp. v. City of Peoria*, 735 F.3d 505, 509–10 (7th Cir. 2013) (internal citations and internal quotation marks omitted). "To claim a property interest protected by the Fourteenth Amendment, a person must have more than a unilateral expectation of the claimed interest. He must, instead, have a legitimate claim of entitlement to it." *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010) (alterations, citation, and internal quotation marks omitted).

Among other arguments, the City asserts that Plaintiff's claim fails because "he lacks any cognizable property interest in or protected entitlement to reparations." (R. 15, Mem. at 7.) The City explains that "[b]ecause the Ordinance specifically excludes Plaintiff from its benefits," he is unable to demonstrate that "he was deprived of any protected property interest." (*Id.*) In response, and somewhat confusingly, Plaintiff argues that he has a protected property interest in receiving payment because "procedural due process is applicable to such benefits as are a matter of statutory entitlement for persons qualified to receive them" and Plaintiff is qualified to receive the reparations because the Ordinance is intended to compensate any individual who has "suffered at the hands of Jon Burge or his subordinates." (R. 23, Resp. at 4 (citation and internal quotation marks omitted).) In reply, the City argues that any benefits "are discretionary" and reiterates that even if the reparations "could be deemed a protected entitlement," the Ordinance's plain terms exclude Plaintiff from entitlement. (R. 24, Reply at 5.)

Plaintiff contends that he has a cognizable property interest in receiving financial reparations under the Ordinance because any "Burge victim is eligible for financial reparations." (R. 23, Resp. at 4 (quoting Ordinance).) However, because any entitlement is discretionary under the Ordinance, Plaintiff does not have a protected property interest in receiving reparations. A protected property interest exists only when the state's discretion is "clearly limited such that the plaintiff cannot be denied the interest unless specific conditions are met." *Brown v. City of Michigan City*, 462 F.3d 720, 729 (7th Cir. 2006) (citation and internal quotation marks omitted). As the Seventh Circuit has explained, an individual has a constitutionally protected property interest in "what is securely and durably yours under state . . . law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain." *Reed v. Vill. of Shorewood*, 704 F.2d 943, 948 (7th Cir. 1983). Thus, a protected property interest must be sufficiently secure and, typically, not subject to discretionary state action.

Plaintiff's right to recover under the Ordinance is not sufficiently secure. The Ordinance puts forth the substantive procedures for determining whether an individual is entitled to reparations. Ordinance at § 3. Specifically, the Ordinance lays out the "[c]riteria to be considered when determining whether a claim is a credible claim," which includes "(1) when and under what circumstances the claim of torture or physical abuse was first made or reported to someone, (2) the consistency of the claim over time, and (3) any credible affirmative proof rebutting the claim." *Id.* § 3(b). Under the Ordinance, CTJM attorneys are to provide a list of individuals to the City who it determines are "eligible Burge victims." *Id.* § 3(d). Subsequently, "after consultation with CTJM attorneys, the City will specify the individuals on CTJM's list whom the City agrees have a credible claim." *Id.* In addition, the Ordinance states that CTJM is to identify "an independent third party"—which was ultimately Professor Coyne—who is tasked with

19

"determin[ing] whether any claimants not previously identified by CTJM as Burge victims are eligible to receive financial reparations using the criteria set forth in this Ordinance." *Id.* § 3(f)(2). Thus, Professor Coyne was tasked with identifying any eligible claimants that CTJM's original list may have excluded. If the independent third party determines that the new claimant is not eligible for financial reparations under the Ordinance, the determination is final and binding. *Id.* However, if the independent third party determines that a claimant is eligible for financial reparations that recommendation is "subject to review by CTJM and by the City." *Id.* If CTJM and the City do not agree that an individual has a credible claim, "such individual is entitled to seek review of the matter before an . . . arbitrator agreed upon by CTJM and the City." *Id.* § 3(e). Therefore, for an applicant that was not previously identified by CTJM (like Plaintiff), only after review by the independent third party and agreement among CTJM and the City, is it determined that an individual has "a credible claim," and thus, "shall be entitled to financial reparations from the Fund." *Id.* § 3(d).

As the above recitation demonstrates, whether an individual is entitled to receive reparations under the Ordinance is subject to the review, discretion, and agreement of multiple parties. Accordingly, contrary to Plaintiff's contention, the right to reparations under the Ordinance is not "securely and durably" his and, thus, it does not rise to the level of a constitutionally protected property interest. *See, e.g., Booker-El*, 668 F.3d at 901 (determining that the plaintiff "has no legitimate expectation to any benefit derived from" a prison's recreation fund when the statute gave officials discretion regarding the distribution of funds and, thus, the plaintiff had "no protected property interest"); *Suburban Towing, Inc. v. Village of Homewood*, No. 11 C 3304, 2012 WL 588801, at *4 (N.D. Ill. Feb. 17, 2012) (dismissing towing company's procedural due process claim and concluding that municipal code "vested discretion in the police

department to select appropriate" towing provider and, therefore, the plaintiff "had no legitimate claim to an entitlement [in continuing to provide towing services on behalf of the police department], and thus does not have a protected property interest"); *McGuire v. City of Chi.*, No. 00 C 8115, 2001 WL 1164129, at *3-4 (N.D. Ill. Sept. 28, 2001) (determining that an ordinance permitting the City to provide defense counsel to city employees was within the city's discretion and thus, "[b]ecause [the plaintiff] has not adequately pled that he has a protected property interest that the Constitution protects, he failed to meet the threshold requirement of a due process claim").

Aside from this barrier, it is also clear that Plaintiff does not have a legitimate property interest in these funds because he does not qualify for payment under the plain language of the Ordinance. The Ordinance defines "Burge victim" as "any individual with a credible claim of torture or physical abuse by Jon Burge or one of the officers under his command at Area 2 or Area 3 Police headquarters between May 1, 1972 and November 30, 1991." Ordinance at § 2. In addition, the Ordinance defines "credible claim" as a "claim of torture or physical abuse by Jon Burge or one of the officers under his command at Area 2 or Area 3 Police headquarters between May 1, 1972 and November 30, 1991." *Id.* § 2. Plaintiff's own allegations state that he was taken to Area 2 on May 10, 1993. (R. 6, Compl. ¶ 6.) Because Plaintiff claims to have been beaten in 1993, Plaintiff is neither a "Burge victim" nor can he have a "credible claim" under the plain language of the Ordinance. In addition, while Plaintiff argues that he has an entitlement to reparations because the Ordinance recognizes that its purpose was to "redress any and all harm that was suffered at the hands of Jon Burge *or* his subordinates," (R. 23, Resp. at 4), Plaintiff is omitting the expressed time limitation requirement contained in the Ordinance that disqualifies him from such reparations.

Put simply, Plaintiff's claim that he is entitled to reparations under the Ordinance is not a legitimate claim of entitlement that would trigger due process protections, but rather a unilateral expectation. Therefore, because Plaintiff's right to reparations under the Ordinance does not rise to the level of a constitutionally protected property interest, he does not have a viable procedural due process claim. As Plaintiff has no protected property interest in receiving financial reparations, the Court does not need to decide whether the City's actions constitute a deprivation of that interest without due process. *See Kim Constr. Co. v. Bd. of Trs. of Vill. of Mundelein*, 14 F.3d 1243, 1245 (7th Cir. 1994) ("Unless [the plaintiff] can establish as a matter of federal constitutional law that its claim is based on a protected property interest, the issue of whether it was afforded due process before being deprived of that interest does not arise."); *Drnek v. City of Chi.*, 192 F. Supp. 2d 835, 851 (N.D. Ill. 2002) ("The police plaintiffs have failed to identify a state law that creates an entitlement to due process . . . , so they cannot state a claim for a deprivation of due process."). Thus, the Court dismisses Plaintiff's procedural due process claim.

Because the Court determines that Plaintiff's claims fail as a matter of law, the dismissal of both of his claims will be with prejudice. In addition, the Court notes that Plaintiff's response does not request an opportunity to replead either claim, does not attach a proposed amended complaint, and does not indicate how he can replead to cure the deficiencies of his complaint. *See Leavell v. Ill. Dep't Nat. Res.,* 600 F.3d 798, 807-08 (7th Cir. 2010) (finding dismissal with prejudice appropriate where plaintiff failed to state procedural due process claim because she did not avail herself of available state procedural protections and did not indicate how she could amend the complaint to cure deficiency). Thus, Plaintiff's equal protection claim and procedural due process claims are dismissed with prejudice.

The Court recognizes that, in light of Plaintiff's disturbing allegations and the fact that the applicable statute of limitations *may* bar any other claims, the dismissal of his claims may be interpreted as a harsh result. However, under the rational-basis standard, the Court is not permitted to "judge the wisdom, fairness, or logic of legislative choices," *Beach Commc's,* 508 U.S. at 313, but is required to "accept a legislature's generalizations even when there is an imperfect fit between means and ends," *Heller*, 509 U.S. at 321. Simply put, the time limitation imposed by the Ordinance is rationally related to the government's legitimate interest in compensating the Burge torture victims—albeit, with the risk that some victims may be left behind. Ultimately, if Plaintiff is advocating for changes to the Ordinance, those changes need to be made by the City, not this Court.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (R. 15) is GRANTED. This case is dismissed with prejudice.

ENTERED: _____

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: September 8, 2016**

23